# United States District Court
## for the Northern District of Oklahoma

Case No. 26-cr-95-JDR

UNITED STATES OF AMERICA,

*Plaintiff*,

*versus*

MICHAEL EDGAR RAY,

*Defendant*.

## OPINION AND ORDER

Kansas Bureau of Investigation Special Agent Garrett Combs received tips from a prison warden and a police detective that Defendant Michael Ray was trafficking narcotics. Dkt. 35-1 at 4.[1] After investigating the allegations, Special Agent Combs sought and received a warrant to place a GPS tracker on a truck Mr. Ray was known to use. *Id.* at 1. The GPS tracker was used to monitor the truck's location. When the truck exhibited suspicious activity in Oklahoma, Special Agent Combs informed federal and Oklahoma law enforcement. Dkt. 35 at 1-3. Oklahoma Highway Patrol initiated a traffic stop during which the trooper spotted bags of methamphetamine on Mr. Ray's front seat. *Id.* at 3. Mr. Ray was arrested and charged with possessing methamphetamine with intent to distribute, possessing a firearm in furtherance of a drug trafficking crime, and possessing a firearm as a convicted felon. Dkt. 2. Mr. Ray moves to suppress all evidence seized and statements obtained resulting from the Kansas GPS tracking device warrant and the prolonged detention and warrantless search of Mr. Ray's person and vehicle, and for a

[1] All citations use CM/ECF pagination.

hearing under *Franks v. Delaware*, 438 U.S. 154 (1978). Dkt. 33. The Court heard oral argument on this motion on August 19, 2026, and denied the motion orally for the reasons stated below. Dkt. 39.

## I

In July 2025, Special Agent Combs received a tip that several individuals, including Mr. Ray, "were involved in the distribution of methamphetamine and trafficking of firearms throughout southeast Kansas" from Deputy Warden Tyler Clark. Dkt. 35-1 at 4. Deputy Warden Clark's source for this information is unknown.

That same month, Special Agent Combs spoke with Cherokee County Sheriff's Office Detective Samantha Snell, who related that a source indicated that Mr. Ray was trafficking methamphetamine within Kansas. *Id.* at 5-6. Detective Snell's source for this information is unknown.

Special Agent Combs's investigation found that Mr. Ray was on parole and probation for various controlled substance violations and had a criminal history dating back to 1992. *Id.* at 5. Special Agent Combs also learned that Mr. Ray had been stopped in June 2025 while driving a white Ford F-150 pickup truck with Kansas tag number 115PTZ, registered to another individual. *Id.* at 6.

Mr. Ray's parole officer placed him on GPS ankle monitoring in August 2025. *Id.* Mr. Ray's ankle monitor showed that he was regularly traveling around Kansas and Oklahoma. *Id.* at 6-8. Special Agent Combs engaged in physical surveillance of a location where Mr. Ray's ankle monitor said he was present and located the same white Ford F-150 truck outside. *Id.* at 7-8. In November, Mr. Ray was again surveilled at a property where another KBI agent observed the white Ford F-150. *Id.* at 9. Mr. Ray had not registered a vehicle with the Kansas drug offender registry, as he was obligated to do, at his November 2025 reregistration. *Id.*

Based on the above facts, Special Agent Combs sought and received a warrant from a Kansas state court judge to install a GPS tracking device on the F-150. Dkt. 33; Dkt. 35-1. In late November, Special Agent Combs informed DEA Task Force Officer Billy Stites of the GPS tracking system and that the white truck was in the Tulsa area. Dkt. 35 at 1-2. Special Agent Combs requested the assistance of Officer Stites. *Id.* Special Agent Combs informed Officer Stites that Mr. Ray had been "arrested before with guns" and had been "known to be armed." *Id.* at 2. Officer Stites shared this information with Oklahoma Highway Patrol Trooper Seth Hudson. *Id.* Trooper Hudson responded to the segment of road where the GPS tracker located the white truck and observed the vehicle violating Oklahoma traffic laws. *Id.* at 3. Trooper Hudson then initiated a traffic stop. *Id.*

During the traffic stop, Trooper Hudson requested the driver's license, proof of insurance, and proof of registration. *Id.* Trooper Hudson identified the driver as Mr. Ray. *Id.* During the stop, Trooper Hudson observed that Mr. Ray's "hands were shaking . . . his breathing appeared labored, and . . . [Mr.] Ray would continuously peer out the side of his eyes to locate where [Trooper] Hudson was outside the vehicle." *Id.* Trooper Hudson directed Mr. Ray to his patrol car while Trooper Hudson conducted a records check. *Id.* As Mr. Ray got out of the truck, Trooper Hudson spotted "a clear white bag with what appeared to be large bundles of crystal methamphetamine." *Id.* at 4. Before continuing, Trooper Hudson conducted a pat-down of Mr. Ray. *Id.*

Trooper Hudson then conducted a records check and a sniff search with his narcotics detection dog. *Id.* The dog alerted, and Trooper Hudson informed Mr. Ray that he would be searching the vehicle and conducted a second pat-down while Mr. Ray was seated in the front seat of Trooper Hudson's patrol car. *Id.* at 5. Trooper Hudson searched the vehicle, located approximately seven pounds of crystal methamphetamine on the front passenger seat, and subsequently arrested Mr. Ray. *Id.*

## II

Mr. Ray raises two arguments in his motion to suppress. First, he argues that the Kansas search warrant was invalid. Dkt. 33 at 7-8. Second, he contends that Trooper Hudson unconstitutionally prolonged the traffic stop in violation of *Rodriguez v. United States*, 575 U.S. 348 (2015), and subjected Mr. Ray to repeated unlawful pat-downs. Dkt. 33 at 8-9.

### A

Mr. Ray asserts that the Kansas GPS tracker warrant was invalid for three reasons. First, he argues that it "fail[ed] to establish a direct, logical nexus between the alleged narcotics distribution enterprise and the white Ford F-150," because Mr. Ray was spotted "using multiple vehicles during the surveillance window." Dkt. 33 at 7. Special Agent Combs's affidavit noted that Mr. Ray had been previously stopped while driving the truck and that Mr. Ray's ankle monitor placed him at the same location as the truck on multiple occasions. Dkt. 35-1 at 6-9.

The affidavit not only included information linking Mr. Ray to the truck, but information linking Mr. Ray and the truck to "locations . . . known or suspected to be involved in the use or distribution of controlled substances" including "the residence for a registered drug offender." *Id.* at 7. Although the GPS tracking device could not conclusively demonstrate that Mr. Ray was using the truck at all times it was tracked, it could, in conjunction with Mr. Ray's existing GPS ankle monitor, assist in the investigation of Mr. Ray's alleged participation in drug trafficking and violation of the Kansas Offender Registration Act. The Court concludes that there is a sufficient "direct, logical nexus between the alleged narcotics distribution enterprise and the white Ford F-150" and the simple fact that Mr. Ray was spotted using other vehicles at the same time does not preclude heightened surveillance of one vehicle in particular. Dkt. 33 at 7. There was sufficient probable cause to support the warrant.

Second, Mr. Ray argues that the warrant improperly bootstrapped administrative violations of the Kansas Offender Registration Act to an investigation for narcotics violations. *Id.* But as the Government points out, KORA requires an offender to register "any vehicle the offender regularly drives" irrespective of the vehicle's legal ownership, and failure to do so is a felony. Dkt. 35 at 10 (quoting K.S.A. § 22-4907). Mr. Ray had been seen using the truck or in close connection to the truck on multiple occasions. Dkt. 35-1 at 6-9. His prior stop while driving the truck and his multiple connections to it constitute probable cause for a GPS warrant to further the investigation of Mr. Ray's alleged KORA violation. So even if Mr. Ray was not under suspicion of a narcotics crime, the warrant could still be issued solely for the suspected KORA violation and was not improper.

Third, Mr. Ray argues that the warrant was improper because it relied on uncorroborated confidential informants without stating "any basis of knowledge, veracity, or past reliability" for the sources in violation of *Illinois v. Gates*, 462 U.S. 213 (1983). Dkt. 33 at 7-8. But *Gates* held that a magistrate analyzing an affidavit supporting a requested warrant must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." 462 U.S. at 238.

Considering all the statements in the affidavit, even setting aside the hearsay testimony about the confidential informants' statements, the affidavit includes allegations that Mr. Ray (a) had driven the truck on at least one occasion, (b) had been in the same place as the truck on multiple occasions, (c) those places were "locations . . . known or suspected to be involved in the use or distribution of controlled substances" including "the residence for a registered drug offender," and (d) Mr. Ray had prior convictions for manufacture, possession, and distribution of controlled substances. Dkt. 35-1 at 5-9.

On their own, these allegations are sufficient for a magistrate to find probable cause to issue a warrant.

But even if they were not, the Court also notes that, under *United States v. Leon*, 468 U.S. 897, 926 (1984), if the officer's "reliance on the magistrate's determination of probable cause was objectively reasonable" then "application of the extreme sanction of exclusion is inappropriate." As noted above, the affidavit included multiple allegations supporting probable cause for a GPS tracker on the truck. There are no allegations indicating that Special Agent Combs did not "act[] with objective good faith" in obtaining the search warrant, *id.* at 920, nor that any officer involved in this case did not engage in "objectively reasonable reliance" on the warrant, *id.* at 922. Nothing about the warrant indicates that any officer would "have no reasonable grounds for believing that the warrant was properly issued." *Id.* at 923. The Court determines that even if there was not probable cause to issue the warrant, *Leon* would require this Court to grant deference to the officers' reasonable reliance on the warrant and deny the motion to suppress as to the warrant.

B

Mr. Ray also alleges that Trooper Hudson unconstitutionally prolonged the traffic stop in violation of *Rodriguez v. United States*, 575 U.S. 348 (2015).[2] Dkt. 33 at 8. Mr. Ray alleges that "Trooper Hudson completed the statutory mission of the stop upon receiving Mr. Ray's valid license, registration, and insurance" and that "[o]rdering Mr. Ray into the patrol vehicle, interrogating him regarding his probation terms, probing his commercial business itinerary, and waiting for multiple backup units to execute a canine sniff"

[2] Although Mr. Ray implies that the stop was unlawful, *see* Dkt. 33 at 8 ("Even assuming that the initial traffic stop for speeding was lawful at its inception"), he does not provide an explanation as to why the stop would be unlawful at its inception.

were not supported because Trooper Hudson lacked "reasonable, articulable suspicion of ongoing criminal activity." Dkt. 33 at 8.

Trooper Hudson stopped Mr. Ray, requested his driver's license, insurance, and registration, and subsequently ordered Mr. Ray out of the vehicle.[3] Dkt. 33 at 8; Dkt. 35 at 15. At the hearing, Trooper Hudson testified that he spotted plastic bags containing what appeared to be methamphetamine in the passenger seat when Mr. Ray got out of the truck.

Once Trooper Hudson spotted the methamphetamine, he no longer was restrained by the purpose of the initial traffic stop. Rather, he now had probable cause because he lawfully observed illegal drugs in plain view and was therefore permitted to conduct a search of the truck. *United States v. Sparks*, 291 F.3d 683, 690 (10th Cir. 2002).

When Trooper Hudson ordered Mr. Ray into his police car and retrieved his criminal records, Trooper Hudson became aware of Mr. Ray's multiple prior convictions for narcotics violations and his status as a parolee. There is an "indisputable nexus between drugs and guns," and the presence of drugs in Mr. Ray's truck and his prior history created a reasonable suspicion of danger to Trooper Hudson. *United States v. Garcia*, 459 F.3d 1059, 1065 (10th Cir. 2006). Trooper Hudson's decision to pat-down Mr. Ray the first time was supported by his plain view of the drugs in Mr. Ray's truck, and his second by the evidence of Mr. Ray's criminal history and Trooper Hudson's intention to turn his back to Mr. Ray to search his truck. Trooper Hudson's decision to give Mr. Ray two pat downs was reasonable and permissible

[3] An officer may lawfully order a driver to exit a vehicle pending completion of a traffic stop without running afoul of *Rodriguez*. *See United States v. Dennison*, 410 F.3d 1203, 1211 (10th Cir. 2005) (citing *Maryland v. Wilson*, 519 U.S. 408, 414 (1997)).

under the circumstances and was not a "pure fishing expedition lacking articulable safety justification." Dkt. 33 at 9.

The Court denies the motion to suppress evidence recovered during Trooper Hudson's stop of Mr. Ray.

III

Separately, Mr. Ray moves for a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), "to challenge conclusionary statements and material omissions made by the affiant regarding the reliability of the confidential sources and subjective inferences drawn between Mr. Ray's personal ankle monitor data and the target F-150 vehicle." Dkt. 33 at 9. But *Franks* makes it clear that "[t]o mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof." 438 U.S. at 171. Mr. Ray does not make any "allegations of deliberate falsehood or reckless disregard for the truth" and does not provide any "offer of proof" to support his assertions. At most, Mr. Ray calls attention to allegedly "conclusionary statements . . . gathered from undisclosed and unproven informants." Dkt. 33 at 9. But simply alleging that statements were gathered from undisclosed sources is not an allegation of "deliberate falsehood or reckless disregard for the truth" and does not merit an evidentiary hearing. The Court denies Mr. Ray's motion for a *Franks* hearing.

IV

Embedded within Mr. Ray's probable cause challenge is the assertion that the Kansas GPS tracker warrant was improper because a federal warrant was required under Rule 41 of the Federal Rules of Criminal Procedure. Dkt. 33 at 9. The Kansas warrant was proper under the facts of this case, and Special Agent Combs was not required to obtain a federal warrant for the tracker.

Special Agent Combs testified that his investigation of Mr. Ray was predominantly focused on Mr. Ray's activities in Kansas, and his affidavit confirms this. *See* Dkt. 35-1 at 5-9. Special Agent Combs further testified that he did not anticipate federal prosecution when he sought the warrant. Before obtaining the warrant, Mr. Ray's ankle monitor provided data that Mr. Ray had traveled to Tulsa, Inola, and Enid, Oklahoma. Dkt. 35-1 at 8. It was only on the second trip to Oklahoma, on November 21, 2025, that Special Agent Combs sought the assistance of Officer Stites, a DEA task force officer who was cross deputized with numerous state task forces.

Mr. Ray suggests that the Kansas tracker warrant lost its state character because the truck crossed state lines, the case is being prosecuted by the United States, and a DEA task force officer was requested to assist the Kansas authorities. This case is analogous to *United States v. Barrett*, 496 F.3d 1079 (10th Cir. 2007) and *United States v. Sadlowski*, 948 F.3d 1200 (10th Cir. 2020). In *Barrett*, the panel held that a state warrant retained its state character because the warrant was requested by a state law enforcement officer, was issued by a state judge, and state authorities were tasked with carrying out the warrant. 496 F.3d at 1090. The state tracker warrant here retained its state character. The tracker was placed on the truck driven by Mr. Ray by state authorities. Dkt. 35 at 1. State authorities monitored the tracker data. *Id.* It was only after the Kansas officers reviewing the tracker data believed Mr. Ray would be in possession of drugs in Oklahoma that the Kansas agent sought the assistance of a DEA task force officer who regularly works with Kansas law enforcement in the Kansas, Oklahoma, and Missouri area. Dkt. 35 at 1-2. These facts would not require the Kansas Special Agent to seek a federal search warrant to place the tracking device on the truck driven by Mr. Ray.

V

For the reasons given above, Mr. Ray's motion to suppress and for a *Franks* hearing [Dkt. 33] is denied.

DATED this 1st day of September 2026.

JOHN D. RUSSELL
*United States District Judge*